☑ Original    ❒ Duplicate



CLERK'S OFFICE
A TRUE COPY
Dec 03, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>black iPhone, model name: A1660, FCC ID: BCG-E3085A, IC:<br>579C-E3085A and a black Samsung Galaxy cellular telephone, IMEI<br>number: 355060721520398. Devices are currently located at the Homeland<br>Security Investigations office, 790 N. Milwaukee Street, Suite 600,<br>Milwaukee, WI 53202, and held in evidence. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   25   MJ   192

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____12/17/2025_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable William E. Duffin_____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:     12/03/2025 at 9:20 a.m.          *William E. Duffin*
                                                                    *Judge's signature*

City and state:     Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
                                                            *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The property to be searched is: a black iPhone, model name: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A and a black Samsung Galaxy cellular telephone, IMEI number: 355060721520398, hereinafter the "Devices". The Devices are currently located at the Homeland Security Investigations office, 790 N. Milwaukee Street, Suite 600, Milwaukee, WI 53202, and held in evidence.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Devices described in Attachment A that relate to violations of 18 USC 2423(b), 18 USC 2422(b) and 18 USC 2252(a)(2) 2252A and involve Justin Dirk KAGERBAUER, including:

      i.  Records or information pertaining to the attempted travel in interstate or foreign commerce with the intent to engage in illicit sexual conduct;

      ii. Records containing child pornography or pertaining to the production, distribution, receipt, or possession of child pornography

      iii. Records or information, photographs, videos, notes, documents, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors;

2.      All names, aliases, and numbers stored in the Devices, including numbers associated with the Devices, relating to the identities of those engaged in the possession, receipt, or distribution of child pornography.

3.      The list of all telephone calls made or received located in the memory of the Devices that provides information regarding the identities of and the methods and means of operation and communication by those engaged in the possession, receipt, or distribution of child pornography.

4.      Any SIM Card located within the Devices that helps to identify the cellular telephone number associated with the Devices.

5.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

6.      Records evidencing the use of the Internet Protocol addresses 71.67.11.202, and 98.144.112.36, and any other associated internet protocol addresses used to log into and access IMGSRC, MEGA.NZ, and/or Telegram chat application, including:

i.    records of Internet Protocol addresses used;

ii.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means


CLERK'S OFFICE
A TRUE COPY
Dec 03, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

black iPhone, model name: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A and a black Samsung Galaxy cellular telephone, IMEI number: 355060721520398. Devices are currently located at the Homeland Security Investigations office, 790 N. Milwaukee Street, Suite 600, Milwaukee, WI 53202, and held in evidence.

)
)
)
)
)
)

Case No. 25 MJ 192

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423(b); 18 U.S.C. § 2422(b); and 18 U.S.C. § 2252(a)(2) | attempted travel in interstate or foreign commerce with the intent to engage in illicit sexual conduct; child enticement; and distribution of child pornography |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TYLER J LALLIER   Digitally signed by TYLER J LALLIER
Date: 2025.12.01 18:41:25 -06'00'

*Applicant's signature*

Tyler L'Allier, DHS-HSI Task Force Officer

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: 12/03/2025

*Judge's signature*

City and state: Milwaukee, Wisconsin     Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Tyler J. L'Allier, having been duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Task Force Officer (TFO) with the Department of Homeland Security, Homeland Security Investigations (HSI), an investigative branch of the United States Department of Homeland Security.  I am a federal law enforcement officer authorized by the Secretary of Homeland Security to request the issuance of criminal complaints and search warrants.  As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.  I have been employed as a TFO with HSI since August 2024 and have over 19 years of Law Enforcement experience.  I am currently assigned to the Resident Agent in Charge Office in Milwaukee, Wisconsin. I have gained experience through training at the Federal Law Enforcement Training Center and everyday work relating to conducting these types of investigations.  I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media.

2.      The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, as well as through information provided to me by other law enforcement officers whom I consider to be truthful and reliable.  Some of the information was provided in response to administrative subpoenas and search warrants.  I believe this information is reliable because it was provided by independent companies in response to court or agency requests.

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices, which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

4.      Based upon the information described below, I submit that probable cause exists to believe that Justin Dirk KAGERBAUER, date of birth XX/XX/1979, on or about March 13, 2025 to November 27, 2025 has committed the crimes of (1) attempted travel in interstate or foreign commerce with the intent to engage in illicit sexual conduct in violation of Title 18, United States Code, § 2423(b); (2) child enticement in violation of Title 18, United States Code, § 2422(b); and (3) distribution of child pornography in violation of Title 18, United States Code, § 2252(a)(2), all while residing at S86W18930 Woods Road, Muskego, Wisconsin 53150 and being present in the Eastern District of Wisconsin and the Northern District of Illinois.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched is a black iPhone, model name: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A and a black Samsung Galaxy cellular telephone, IMEI number: 355060721520398, hereinafter the "Devices".  The Devices are currently located at the Homeland Security Investigations office, 790 N. Milwaukee Street, Suite 600, Milwaukee, WI 53202, and held in evidence.

7.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## <u>BACKGROUND ON IMGSRC</u>

8.     IMGSRC is an online platform that has operated since at least in or about June 2012, and describes itself as "a rapidly growing community, dedicated to photo sharing, where users can browse through its vast collection of all kinds of amateur and professional photos with thousands uploaded daily." Membership to IMGSRC is free and includes unlimited hosting storage and free photo sharing of digital images (not videos). IMGSRC is organized by different forums according to topic. Examples include topics such as "architecture," "travel," "family," and "autos." Each IMGSRC forum contains albums posted and named by the registered IMGSRC user who created the album.

9.     To register an account, and thus become an IMGSRC "member," a user must create an IMGSRC username and provide a valid email address in order to receive a password provided by IMGSRC. Upon receiving this password, a user is prompted to create a new password which will be used to log in to IMGSRC. Once this is done, the user, as a member, may log in and create albums and post images within these albums.   A user's albums are listed under their username.  When a member creates an album, they may choose to have his contact email address displayed under his username (which appears at the top of the album) to others visiting his albums or instead ask others to "contact via comments."  Even in instances where a member does not post his email address so other members can see it, it is not uncommon for the member to post the address in the comment section as a means of contact or when responding to a specific request from another member.  A member can create one or more photo albums and has the choice to make an album available to all individuals on the Web (a "public album") or make it a password protected album that is only accessible to individuals who know or have the password. An album consists of all of the pictures associated with that album, along with any posted comments. When

a member creates an album, he has a choice via a scroll-down menu to allow: only IMGSRC members who have created albums on IMGSRC to add a comment, only IMGSRC members to comment (regardless of whether these members have created their own albums on IMGSRC), and/or anyone accessing IMGSRC (whether or not they are an IMGSRC member) to anonymously comment on the album, or to disable the comment feature. Anytime an individual posts a comment to an album, the owner of that album is automatically notified by IMGSRC via the email he provided as his contact email address. The email message states that a comment was made and includes the file name of the image commented on, the comment itself, the IMGSRC username of the person making the comment (if the person posting the comment is an IMGSRC member) and a hyperlinked URL to the image with the corresponding comment. While the member who is the owner of an album cannot directly opt out of receiving these email notifications, if he were to go back into his membership profile and delete the email address he provided to IMGSRC as his contact information he will not receive these automated email notifications.

10.     Any individual on the Internet can view and post comments to non-password protected albums ("public albums") on IMGSRC and download the images in those albums. Only members can create albums and upload pictures to albums. When an IMGSRC member posts a comment to an album, that member's username, country flag corresponding to the originating IP address, and the date and time of the comment are displayed next to the comment. When a comment is posted by a non-member of IMGSRC, portions of the originating IP address and a country flag corresponding to that IP address are displayed next to that comment. Regardless of whether the individual posting a comment is a member or non-member, IMGSRC logs the full originating IP address of the individual posting the comment.

## BACKGROUND ON MEGA

11.     MEGA (stylized in all uppercase letters) or MEGA.io is an encrypted cloud-based storage and file hosting service offered by MEGA Limited, a company based in Auckland, New Zealand.  The service is offered primarily through web-based apps.  MEGA mobile apps are also available for Android and iOS.  MEGA is known for its large 50 GB storage allocation for free accounts.  A user creates an account with a login and can upload content to their account.  A user can create links to allow others to access a specific folder/album within their account.  The user then shares the links with other users who can view the content without having to log into MEGA.  Any user that clicks the link can download the files contained in the link since the link includes the decryption key. Additionally, since the link contains the file path and decryption code, any person can simply copy and re-post the link even if they are not the owner of the link.

12.     MEGA also has private chat rooms that users can create.  Users can send links that allow others to access the private chats. These private chats are end-to-end encrypted, so only people who entered the chats via the secure links can see the content. Since a private chat room link contains the file path and decryption code, any person can simply copy and re-post a link even if they are not the owner of the link.

13.     The content maintained by MEGA is encrypted.  MEGA cannot access a user's account or view its content without the password or decryption code.  However, if another user and/or law enforcement identifies a particular MEGA link as containing child sexual abuse material (CSAM) and notifies MEGA, MEGA will review the link.  If MEGA determines that the link contains CSAM or violates their terms of service, they will suspend the account.  MEGA does not respond to legal process from the United States but provides basic subscriber records to law enforcement upon request as part of their course of business.

14.     Cloud storage providers like MEGA typically retain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via MEGA's website or mobile application), number of files contained in the account, data size contained in the account, and other log files that reflect usage of the account.  In addition, cloud storage providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the cloud storage account, which can help establish the individual or individuals who had dominion and control over the account.  Cloud storage providers like MEGA also routinely maintain records of user activity, such as when files are uploaded, shared, or removed.

15.     Due to its encryption, MEGA has become a popular cloud-based storage repository and/or location to distribute CSAM.  Since MEGA does not restrict the same IP address from creating more than one MEGA account, persons involved in the receipt, collection, and distribution of CSAM often have multiple MEGA accounts.

16.     The above-described encryption means users of applications like MEGA are difficult to identify. The privacy and protection provided by encrypted chat applications makes them popular among those engaged in producing, distributing, receiving, and possessing sexually explicit content depicting children. Users of these applications often know they can operate with a higher level of anonymity than they can on unencrypted messaging applications.

17.     MEGA does, however, use "push tokens." A push token is a unique identifier generated by Apple (iOS) and Google (Android) smart phones. These push tokens allow applications to "push" notifications – such as new incoming messages – to users' smart phones. From my training and experience, I know a push token can be used to identify the device(s) on which an individual has installed MEGA and receives push notifications from the application.

18.     MEGA assigns users unique identification numbers, and users can choose usernames and communicate with each other in groups or one on one. When invited to a group on MEGA, a user must accept the invitation before becoming a member of the group. Users of MEGA do not have to actively participate in groups of which they are a member to receive messages and media shared by other users.

## BACKGROUND ON TELEGRAM

19.     Telegram is an Internet-based messaging and social-media application for smartphones, tablets, and computers. According to its public statements, it has more than 200 million active users. Telegram is free and signing up requires only a supported device and a telephone number. The telephone number serves as an identifier for the account and allows for two-step verification, but users are free to use a temporary number, voice-over-IP number, or other type of anonymous phone number to create a Telegram account. Telegram users also can, and in HSI's experience frequently do, choose not to display the associated phone number to other users. Users typically choose a public-facing username to communicate with one another, and this allows Telegram users to search for other users' usernames. Such public-facing usernames, however, are not required and it is thus possible for a person to use Telegram without a searchable username.

20.     Through the application, users can transmit messages, photos, videos, and other types of files with one another. Telegram users can also create and participate in "groups," which

allow up to 200,000 users to exchange messages and files, including photos and videos. Telegram groups can be either private or public and can also be made subject to the supervision of administrators; who can control membership in the group, including by adding members to the group. A group administrator, and in some cases group members, can add new members to a group without any action on the part of those new members. When a member is added to a group by someone else, that member will see the existence and name of the new group in the Telegram interface. Before the member can view or access any postings in that group, the member would need to click on the group to enter it, which will make some of the group's content viewable in the member's chat window. In addition, anyone in a group can formally leave the group, close the window showing the group chat (including shared links and files), or simply decline to participate in any group chat or activity.

**PROBABLE CAUSE**

21.     In September 2025, Homeland Security Investigations (HSI) Milwaukee, WI was contacted by HSI Attache London, England, United Kingdom for assistance on a child exploitation investigation involving an individual within the HSI Milwaukee area of responsibility (AOR) who, while in communication with United Kingdom (UK) law enforcement authorities operating in an undercover (UC) capacity, expressed interest in traveling to the UK to engage in sexual activity with a minor female.

22.     In July 2025, HSI London received a request from the UK's Eastern Regional Special Operations Unit (ERSOU) to help identify the user of vb3naw@tuta.mail, believed to reside in the United States, who was the target of a child sexual exploitation (CSE) investigation. ERSOU advised that the user of this account first contacted, by email, an online undercover (UC) profile being used by UK law enforcement authorities on the IMGSRC website. The UC profile

was of an adult female who was a "bad Aunty" and purported to be sexually active with her 9-year-old niece.

23.     The vb3naw@tuta.mail user made comments about the child in the profile picture eventually stating that he was interested in girls "6+". The user further stated, "I have no experience (Note-with children), but I would love to. It would be a dream come true. I can only imagine how awesome it would be".

24.     The user stated to the UC officer that he was in the UK, in Liverpool, for 6 days in March 2025, with his 17-year-old son who was trying out for a football (soccer) program and hopes to attend university in the UK in September 2025.

25.     The user chatted with the UC officer for several days, later switching communication from email to chat on MEGA.NZ. The chats involved both generally friendly chats with the adult, as well as sexual toward the 9-year-old. The user and the UC officer exchanged chats on 10 separate days in March 2025, 6 days in April 2025, 13 days in July 2025, 25 days in August 2025, 16 days in September 2025, 20 days in October 2025, and at least 1 day in November 2025. On multiple occasions, the user expressed his sexual interest in young girls. For example, on April 17, 2025, at 2:30 PM, the user was asked by the UC officer what he would love to explore first with her, referring to 9-year-old. The user's response was "Mmmm…that is a great questions. Licking sounds amazing. I would love to explore every inch of her soft skin, hear her giggle, pleasure her every way I can."

26.     In July 2025, the user told the UC he would be in the UK in September 2025 taking his son to university, with the chats again being sexual towards the 9-year-old, and also of a general nature. On July 14, 2025, the UC officer sent the user a clothed image of the 9-year-old girl (the UC's purported niece). The user's response was "Oh my goodness, she is more adorable

that I could have imagined! What a little cutie!! Really going to have to have to work hard to make a trip to Kent into my itinerary." On July 17, 2025, the UC officer asked the user what he would like the 9-year-olds perfect little lips to do. The user wrote, "First I would love to taste them on mine. I would love to feel how soft and gentle they feel against my lips. Taste how her sweet saliva tastes. Feel how gentle of a soul she is" and "After some nice kissing and touching, I would love to feel how those soft lips and hands would feel sucking and kissing down lower. Having her learn what she can do with her mouth to pleasure males. I would love for her to try different things to see how she enjoys it and how it creates enjoyment in others."

27.     On multiple occasions, the user expressed his true desire to engage in sexual contact with a child. For example, on March 17, 2025, after the UC asked him what ages her prefers and if he had sexual experience with children, the user responded, "5-13 is perfect" and that he has "no experience but I would love it to be a dream come true. I can only imagine how amazing it would be." On July 31, 2025, the user told the UC that it makes him "so horny" to think about an adult performing oral sex on a female child. On September 5, 2025, the user told the UC that he is not "stringing her along" and reiterated his plans to visit her and the child in November 2025. On September 24, 2025, the user told the UC that he is "most definitely" planning to see her and the child in November 2025 and told her that it is a "fantasy come true." On October 1, 2025, the user told the UC, "I am looking forward to licking and tasting [the child] so bad right now!" During the same conversation when the UC asked the user if he planned to use his penis on/with the child, the user responded, "Touching my penis to her soft pussy would be incredible and being inside her would be a fantasy come true." These are just a sampling of the user's statements to the UC via MEGA chats.

28.     A review of the chats observed the following information in the chat where the user stated: his name was Justin, claimed to be employed to design single family homes, claimed to live in the upper Midwest with Chicago being the closest city, his son was accepted to Hope University (Liverpool, UK area), he has an ex-wife and two sons (14 and 18 years old), he plays volleyball, and admitted to the UC officer he views child pornography online, and chats to other likeminded people about sexual interest in children, but has never acted on his sexual attraction to children. On August 26, 2025, Justin sent an image to the UC officer of his desk. On the desk under his monitor that had a blueprint on it were 14 rubber duckies that Justin said he won at the bar he plays volleyball at.

29.     ERSOU obtained internet protocol (IP) data relating to this user from MEGA.NZ and provided three IP addresses. These addresses were associated with Charter Communication and on or about August 27, 2025, a Homeland Security administrative summons was submitted Charter, requesting subscriber information on IP addresses: 68.188.119.167 (Business) June 21, 2025 20:53:08 UTC, 71.67.11.202 (Business) March 24. 2025 14:50:06 UTC, and 98.144.112.36 April 15, 2025 12:24:23 UTC. On or about September 8, 2025, Charter Communications responded to the summons, indicating: 68.188.119.167 (Business) June 21, 2025 20:53:08 UTC resolves to LHM – 210 North Tucker Blvd., St. Louis, MO, 71.67.11.202 (Business) March 24. 2025 14:50:06 resolves to Espire Homes – 530 Hartbrook Drive, Hartland, WI 53029, and 98.144.112.36 April 15, 2025 12:24:23 UTC resolves to S86W19830 Woods Road, Muskego, WI 53150, as residential account associated to Tami Ericson.

30.     HSI London reviewed the public website for Espire Homes and found an area entitled "Meet the Team", which listed 36 employees, including one named Justin KAGERBAUER. KAGERBAUER's bio stated the following:

- Justin Kagerbauer

- Position: Plan Designer

- Categories: New Construction Team

- "Justin joined the Espire New Construction Team in July 2021. After acquiring his architecture degree from UW-Milwaukee, he has spent more than 20 years in residential construction design. As a designer, he helps our clients turn their biggest and grandest dreams into reality by creating a home design that meets their every need, want, and expectation. When he's not working, he enjoys playing volleyball and soccer and spending time at the lake with his family."

31. The profile information appears to corroborate information provided by the MEGA user, linking it to KAGERBAUER.

32. HSI London used a commercially available website and found links between KAGERBAUER and the address S86W19830 Woods Road, Muskego, WI, 53150, which is associated to IP address: 98.144.112.36 April 15, 2025 12:24:23 UTC, associated to the user's MEGA.NZ account, to include his Wisconsin driver's license having the Woods Road address as his address of record. Additional investigative efforts found KAGENBAUER associated with a Wisconsin Soccer club, the "Croatian Eagles" where he is listed as "Accounts Receivable", and "Director of Tryouts". It was also observed on another commercially available social network site that the Croatian Eagles showed that 18-year-old Kaden Kagerbauer was in England in March 2025 working with the Liverpool Football club under 18. A check of travel history found that both

Justin and Kaden KAGERBAUER travelled from Chicago to Manchester, England, UK, by commercial flight in March 2025.

33.     HSI London later confirmed that further chats between the user, believed to be KAGERBAUER, and the UK UC officer, has reached a point where he stated he is planning a trip to the UK to visit his son, however KAGERBAUER also indicated he wants to travel to London for illicit sexual conduct with the child.

34.     On October 8, 2025, the user and the UK UC discuss the travel plans of the user coming to the UK to visit, saying, in part:

UC: Did you confirm your plans yet about when you are arriving?

USER: I will be buying my tickets by the weekend at the latest. Is there a better day for you for me to arrive

UC: I cant remember what exactly the dates were just recall that Im not around for the December dates you mentioned

USER: Most likely I would arrive on Friday Nov 28 if that works for you

USER: And then leaving on Friday Dec 5.

USER: It would be fun to see both of you again before I left if the first visit went well, so I am a little bummed you are busy but totally understand.

UC: It's a shame your window is so small for you seeing us but never mind. I am sure you will be back in the UK again if the visit goes well which im sure it will. Yes 28th Nov works well and you're more than welcome to stay for a few days with us before you go up to see your son.

USER: Wow, thank you for the offer!! You haven't even met me yet **smile emoji**. Would you have room for me **laughing emoji** Yes I know I hate that the trip has to be so short and I am actually going to have to work remotely for most of it.

35.     On October 15, 2025, the user and the UK UC discuss the user having purchased his tickets to the UK, saying, in part:

USER: Happy hump day. Hope you are doing well. Just wanted to let you know I have purchased my ticket to London. Change of plans again, I back to arriving on Friday morning Nov. 28th. I still need to purchase my tickets back to the United States.

UC: Happy Wednesday! Oh that's great, what time do you arrive on Friday do you know?

USER: Around 930am. I thought that would be better for you than the flight that arrived at 6 am lol

UC: hahah yes thank you! Makes it easier to pick you up if you need

USER: Ha ha yes, if you are still willing to do that I thought that may work a little nicer. I know I am not a morning person lol

USER: How far are you from Heathrow?

UC: Its about 1hr 40 mins depending on traffic so not too bad really

USER: Would it be better for me to take a train or bus closer to you?

USER: Should I trust your driving lol **laughing emoji**

UC: I really dont mind haha. I just thought it would be annoying for you to get a train to Kent as you would have to go into London to catch a train to Kent but up to you

USER: Well, I am putting a lot of trust in you so….I am sure I can trust your driving, but whatever is easier for you.

A check of Google maps shows that Kent is approximately one (1) hour and 30 minutes southeast of London by driving, and Liverpool is approximately four (4) hours and 20 minutes by driving or two (2) hours and 20 minutes by train, northwest of London.

36.     A Homeland Security administrative summons was served on JetBlue airlines requesting ticket and itinerary information related to KAGERBAUER's potential travel to the UK. On or about November 19, 2025, JetBlue responded to the summons indicating KAGERBAUER is scheduled to depart Chicago O' Hare airport to JFK airport on November 27, 2025 at 8:20am on JetBlue B6-1306, then depart JFK airport to London Heathrow airport on November 27, 2025 on JetBlue B6-7 at 9:09pm.

37.     ERSOU provided transcripts of three (3) phone calls, made on October 13, 2025, October 27, 2025, and November 3, 2025, between KAGERBAUER and the UK UC officer. Additionally, ERSOU advised HSI London that on or about November 13, 2025, KAGERBAUER sent the UK UC officer a video depicting child sexual abuse material (CSAM), via the Telegram chat application. The video is two (2) minutes and 25 seconds long, and depicts an adult woman and a pre-pubescent female child, approximately 6-8 years old, where the adult female performs sex acts on the child, to include the child touching and kissing the adult female's breasts, and the adult female touching, rubbing and penetrating the minor female's vagina with her fingers, and performing oral sex on the minor. This was done in response the UK UC officer sending KAGERBAUER a video that appeared to depict CSAM, but was not an actual child, but utilized a "doll" that appeared to be a minor female. After receiving that video, the user replied to the UC, "oh my goodness, that is amazing." The video sent by the user was sent to HSI Milwaukee, where I have personally reviewed the video and can confirm the above description of the video is accurate.

38.     On October 28, 2025 (the day after one of the phone calls), the user told the UC that it "calms his fears" when they speak on the phone and that is "counting down the days" until he meets her and the child in person. The user told the UC that the sexual contact the UC's niece would be a "fantasy [he] has had for a very long time."

39.     On or about November 13, 2025, the user and the UC chatted about the use of "dirty" phones for their chats, and not their normal, personal phones. The user states, "Is that why you seem to mostly only message me on weekday afternoons and early evenings? Lol". To which the UC replies, "I message when I can but this isnt my normal phone for obvious reasons. I dont carry it with me all day or have it around." The user then responds, "Ha ha…wow, you are very much like me lol. I do the same thing **smile emoji**"

40.     HSI Milwaukee was informed that between November 3, 2025, and November 27, 2025, the UC continued to communicate with KAGERBAUER. Those subsequent chats were solidifying the plans on how, where, and when to meet in the UK.

41.     On November 27, 2025, HSI Milwaukee and HSI Chicago O'Hare encountered KAGERBAUER at Chicago O'Hare airport and executed a federal warrant for his arrest and presented him in U.S. District Court for the Eastern District of Wisconsin for his initial appearance.

42.     Pursuant to his arrest and a search of KAGERBAUER's person, two cellular devices were located on KAGERBAUER's body. One of the cellular devices matched the device type that MEGA provided from the chats between the UC and KAGERBAUER.

43.     Your affiant believes based on his knowledge, training , and experience that a search of the cellular devices located on KAGERBAUER's person will show KAGERBAUER as committed violation of of (1) attempted travel in interstate or foreign commerce with the intent to

engage in illicit sexual conduct in violation of Title 18, United States Code, § 2423(b); (2) child enticement in violation of Title 18, United States Code, § 2422(b); and (3) distribution of child pornography in violation of Title 18, United States Code, 2252(a)(2)

## <u>CONCLUSION</u>

Based on the information above, I submit that there is probable cause to believe that KAGERBAUER has committed violations of (1) attempted travel in interstate or foreign commerce with the intent to engage in illicit sexual conduct in violation of Title 18, United States Code, 2423(b); (2) child enticement in violation of Title 18, United States Code, § 2422(b); and (3) distribution of child pornography in violation of Title 18, United States Code, § 2252(a)(2), all while residing at S86W18930 Woods Road, Muskego, Wisconsin 53150 and being present in the Eastern District of Wisconsin and the Northern District of Illinois, between March 13, 2025 and November 27, 2025.property to be searched is a black iPhone, model name: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A and a black Samsung Galaxy cellular telephone, IMEI number: 355060721520398, hereinafter the "Devices". The Devices are currently located at the Homeland Security Investigations office, 790 N. Milwaukee Street, Suite 600, Milwaukee, WI 53202, and held in evidence.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A

The property to be searched is: a black iPhone, model name: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A and a black Samsung Galaxy cellular telephone, IMEI number: 355060721520398, hereinafter the "Devices".  The Devices are currently located at the Homeland Security Investigations office, 790 N. Milwaukee Street, Suite 600, Milwaukee, WI 53202, and held in evidence.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Devices described in Attachment A that relate to violations of 18 USC 2423(b), 18 USC 2422(b) and 18 USC 2252(a)(2) 2252A and involve Justin Dirk KAGERBAUER, including:

      i. Records or information pertaining to the attempted travel in interstate or foreign commerce with the intent to engage in illicit sexual conduct;

      ii. Records containing child pornography or pertaining to the production, distribution, receipt, or possession of child pornography

      iii. Records or information, photographs, videos, notes, documents, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors;

2.      All names, aliases, and numbers stored in the Devices, including numbers associated with the Devices, relating to the identities of those engaged in the possession, receipt, or distribution of child pornography.

3.      The list of all telephone calls made or received located in the memory of the Devices that provides information regarding the identities of and the methods and means of operation and communication by those engaged in the possession, receipt, or distribution of child pornography.

4.      Any SIM Card located within the Devices that helps to identify the cellular telephone number associated with the Devices.

5.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

6.     Records evidencing the use of the Internet Protocol addresses 71.67.11.202, and 98.144.112.36, and any other associated internet protocol addresses used to log into and access IMGSRC, MEGA.NZ, and/or Telegram chat application, including:

    i.   records of Internet Protocol addresses used;

    ii.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.